562 S.E.2d 668

**The STATE, Respondent,**

v.

**Kenneth Andrew BURTON, Appellant.**

**No. 3466.**

Court of Appeals of South Carolina.

Heard March 5, 2002.

Decided March 25, 2002.

Rehearing Denied May 15, 2002.

Senior Assistant Appellate Defender Wanda H. Haile, of the South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Robert E. Bogan, and Senior Assistant Attorney

General Charles H. Richardson, all of Columbia; and Solicitor W. Townes Jones, IV, of Greenwood, for respondent.

ANDERSON, J.

Kenneth Andrew Burton appeals his convictions for resisting arrest, pointing and presenting a firearm, and assault on a police officer while resisting arrest. Burton raises two issues on appeal.[1] We reverse, finding the trial court erred in denying Burton's motion for a directed verdict.

## *FACTS/PROCEDURAL BACKGROUND*

Three Laurens city police officers and an officer from the Honea Path Police Department stopped at the Green Street Mini–Mart store in Laurens during a routine warrant team operation. They had several outstanding warrants and were attempting to find the named individuals to serve them. The officers parked their cars and began individually asking persons in the store's parking lot to produce picture identification. They did not have photographs of the individuals named in the warrants, so they relied on the cooperation of those they encountered to show their identification voluntarily.

Detective Tracey Burke, a five-year veteran of the Laurens Police Department, was in "plain-clothes" that day, but he wore a black bullet-proof vest with the word "POLICE" written on it in large, white letters. Detective Burke approached Burton, who was standing at a pay telephone booth with his right hand in his coat pocket and his left hand holding the telephone receiver to his right ear. As he approached, Detective Burke asked Burton for his identification. Burton did not comply or otherwise respond. Detective Burke repeated his request several times, but Burton remained silent. Burton's right hand remained in his pocket throughout the encounter. Detective Burke asked Burton to remove his hand from his pocket. Burton did not comply with this request either. Detective Burke repeated the request. Burton again failed to comply.

---

1. Although Burton raises two issues on appeal, we reverse based upon the second issue. Accordingly, we decline to address the merits of the first issue on appeal.

Detective Burke moved behind Burton, reached around him, and thrust his hand into Burton's coat pocket. As soon as Burke touched Burton's hand inside the coat pocket, Burton jerked his right shoulder back against Burke and fought with him. Detective Burke grabbed Burton and the two fell to the ground in a struggle. As the two fought, Lieutenant David King of the Honea Path Police Department spotted the handle of a gun coming out of Burton's coat pocket. Lieutenant King yelled "gun" and the other officers raced to assist Detective Burke. Still on the ground, Burton raised up on his left side, pointed the gun at Detective Burke, and pulled the trigger several times. The gun, however, did not fire. A round had jammed in the chamber. The officers seized the gun, subdued Burton, and placed him in handcuffs.

Sergeant Levester Hill and Officer Gerald Deal of the Laurens Police Department arrived on the scene to assist in the matter. Burton continued to struggle and shout obscenities at the officers while awaiting transport to the police station. Because Burton would not wait calmly, Sergeant Hill and Officer Deal placed him on his stomach on the ground. Burton, who was bleeding at the mouth, then appeared ready to spit on Sergeant Hill. Sergeant Hill warned Burton not to spit on him. Burton then turned his head and spit in Officer Deal's direction. As Burton spat, Officer Deal backed away from Burton; nevertheless, Burton's bloody spittle landed on Officer Deal's boot. Officer Deal testified at trial that Burton's actions did not result in injury or make him fearful because the spittle did not make contact with his skin.

Burton was charged with and convicted of the federal offense of unlawful possession of a firearm by a felon in federal district court. The federal district court sentenced Burton to 115 months imprisonment.

Burton was indicted in state court by the Laurens County Grand Jury for assaulting Detective Burke while resisting arrest (Count I); assault with a deadly weapon with the intent to kill Detective Burke (Count II); assaulting Officer Deal while resisting arrest (Count III); and assault with the intent to kill Officer Deal (Count IV). At trial, Burton proceeded *pro se* and moved for a directed verdict on all four counts. The trial judge directed a verdict for Burton on Count IV,

finding there was no evidence to support the charge. The trial judge denied Burton's directed verdict motions as to the remaining charges. The judge, however, agreed to charge the jury with the lesser offense of resisting arrest on Counts I and III and pointing and presenting a firearm for Count II.

Burton was convicted of resisting Detective Burke's arrest, pointing and presenting a firearm, and assault on Officer Deal while resisting arrest. The trial court sentenced Burton to a total of eight years imprisonment to be served concurrently with his federal imprisonment.[2]

## ISSUE

Did the trial court err in denying Burton's motions for directed verdict because law enforcement did not have "reasonable suspicion" to frisk?

## LAW/ANALYSIS

■■ Burton argues the trial court should have directed a verdict on all of the charges against him because they were the product of an improper *Terry*[3] stop. We agree.

Detective Burke testified at trial he approached Burton because he noticed Burton speaking on the pay phone and wanted to ask Burton for identification. Detective Burke was not aware whether Burton's name was on the outstanding warrant list. Burke became suspicious of Burton because Burton did not respond to the officer's questions or comply with the request to remove his hand from his coat pocket. Burke testified he reached into Burton's pocket because Burton would not respond to the questions and was fearful that Burton could have had a beer, drugs, or a weapon in his pocket. When questioned at trial regarding why he believed Burton's pocket contained beer, drugs, or a gun, Burke stated:

> Yes sir. Because prior to us going to Green Street Mini Mart, we ran up on a lot of individuals and we would ask for I.D. and each one of those individuals cooperated with us. I

---

**2.** Burton's conviction in federal district court was reversed by the United States Court of Appeals for the Fourth Circuit. *United States v. Burton*, 228 F.3d 524 (4th Cir.2000).

**3.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

mean, they told us who they was. If they had an I.D. card on them, they handed us an I.D. card. We looked at it, identified them, and they went on their way. We had no problem with anybody else until we ran up on you and at that point with a hand stuck inside of your coat and no response from you, then yes, we was kind of fearful for our safety and everybody else's, too.

■ The Fourth Amendment of the United States Constitution—applicable to the states through the Fourteenth Amendment—guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amends. IV & XIV; *State v. Woodruff*, 344 S.C. 537, 544 S.E.2d 290 (Ct.App.2001), *cert. denied; see also Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.").

■ "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen ...." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (citation omitted); *see also Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (recognizing that law enforcement officers may question citizens without implicating Fourth Amendment protections); *Terry v. Ohio*, 392 U.S. 1, 34, 88 S.Ct. 1868, 1886, 20 L.Ed.2d 889 (1968) (White, J., concurring) ("There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way."); *State v. Foster*, 269 S.C. 373, 379, 237 S.E.2d 589, 591–92 (1977) (quoting *Terry*, recognizing that a law enforcement officer's addressing questions to citizen on the street does not bring the Fourth Amendment into play); *State v. Rodriquez*, 323

S.C. 484, 491, 476 S.E.2d 161, 165 (Ct.App.1996) ("In determining whether an encounter between a law enforcement official and a citizen constitutes a seizure, and thereby implicates Fourth Amendment protection, the correct inquiry is whether, considering all of the circumstances surrounding the encounter, a reasonable person would have believed he was not free to leave. So long as the person approached and questioned remains free to disregard the officer's questions and walk away, no intrusion upon the person's liberty or privacy has taken place and, therefore, no constitutional justification for the encounter is necessary.") (citations omitted).

█ The authority of a police officer to initiate such "police-citizen encounters" is the same as, but no greater than, the authority of an ordinary citizen to approach another on the street and ask questions. *Terry v. Ohio,* 392 U.S. 1, 32, 88 S.Ct. 1868, 1885, 20 L.Ed.2d 889 (1968) (Harlan, J., concurring). Notwithstanding a law enforcement officer's position of authority, a citizen approached in this manner has the right to "ignore his interrogator and walk away." *Id.* at 32–33, 88 S.Ct. at 1885–86.

█ An individual's refusal to cooperate with questioning during a "police-citizen encounter," without more, does not furnish the minimal level of objective justification needed for detention or seizure. *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *Immigration & Naturalization Serv. v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *cf. Illinois v. Wardlow,* 528 U.S. 119, 125, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000) (ruling unprovoked flight of an individual while being questioned during a "police-citizen encounter" is not "a mere refusal to cooperate" or "going about one's business"; concomitantly, allowing officers confronted with such flight to stop individual and investigate further is "quite consistent" with the well recognized right to "go about [one's] business or to stay put and remain silent in the face of police questioning.").

■ A police officer may elevate a "police-citizen encounter" into an investigatory stop or detention only if the officer has a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968)); *see also Sibron v. New York,* 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968) ("The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so.") (citation omitted); *State v. Blassingame,* 338 S.C. 240, 248, 525 S.E.2d 535, 539 (Ct.App.1999) ("A police officer may stop and briefly detain and question a person for investigative purposes, without treading upon his Fourth Amendment rights, when the officer has a reasonable suspicion supported by articulable facts, short of probable cause for arrest, that the person is involved in criminal activity.") (citing *Terry, State v. Robinson,* 306 S.C. 399, 412 S.E.2d 411 (1991); *State v. Foster,* 269 S.C. 373, 237 S.E.2d 589 (1977); *State v. Fowler,* 322 S.C. 263, 471 S.E.2d 706 (Ct.App.1996)).

■ Reasonable suspicion is something more than an "inchoate and unparticularized suspicion" or "hunch." *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883. Instead, reasonable suspicion is founded upon "the specific reasonable inferences" the law enforcement officer "is entitled to draw from the facts in light of his experience." *Id.* (citation omitted); *see also State v. Blassingame,* 338 S.C. 240, 248, 525 S.E.2d 535, 539 (Ct.App. 1999) ("The term 'reasonable suspicion' requires a particularized and objective basis that would lead one to suspect another of criminal activity.") (citations omitted). In determining whether reasonable suspicion exists, the totality of the circumstances (*i.e.,* "the whole picture") must be considered. *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), *Blassingame,* 338 S.C. at 248, 525 S.E.2d at 539; *State v. Lesley,* 326 S.C. 641, 486 S.E.2d 276 (Ct.App.1997).

■ The government bears the burden to articulate facts sufficient to support reasonable suspicion. *See Florida v.*

*Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

Once a basis for a lawful investigatory stop exists, a law enforcement officer may protect himself during the stop by conducting a search or frisk for weapons if he has reason to believe that the suspect is "armed and dangerous." *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968); *see also Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose.") (footnote and citation omitted); *Sibron v. New York,* 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968) ("In the case of the self-protective search for weapons, [the law enforcement officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.") (citation omitted); *State v. Fowler,* 322 S.C. 263, 267, 471 S.E.2d 706, 708 (Ct.App.1996) ("[B]efore the police may frisk a defendant, they must have a reasonable belief the defendant is armed and dangerous.") (citation omitted). This search or frisk is typically achieved by way of a "pat-down" of a detainee.

In determining whether a stopped individual is armed and dangerous, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883 (citations omitted). "[I]n justifying the particular intrusion[,] the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880 (footnote omitted). The *Terry* Court's rubric for determining whether a stopped individual is armed and dangerous has been recognized by our appellate courts. *E.g., State v. Woodruff,* 344 S.C. 537, 544 S.E.2d 290 (Ct.App.2001), *cert. denied; State v. Smith,* 329 S.C. 550, 495 S.E.2d 798 (Ct.App.1998).

The State cites *State v. Nelson*, 336 S.C. 186, 519 S.E.2d 786 (1999), for the proposition that "notwithstanding a strong causal connection in fact between lawless police conduct and a defendant's response, if the defendant's response is itself a new, distinct crime[,] then the police may arrest the defendant for that crime." *Id.* at 194, 519 S.E.2d at 790 (citation omitted). *Nelson* is inapposite. In the case on appeal, the evidentiary record reveals a continuous flow of action and conduct having a direct nexus to the defective *Terry* frisk and emanating from the initial "police-citizen encounter."

The only activity that Detective Burke pointed out as "suspicious" was Burton's refusal to answer the detective's questions and the fact that Burton's right hand remained in his coat pocket. However, Burton was certainly within his rights to ignore Detective Burke, refuse to answer his questions, and keep his hand in his coat pocket. Although Detective Burke testified that he feared for the safety of those around him, he based this fear on his speculation that Burton could have had a beer, drugs, *or* a gun in his pocket. Burke did not articulate anything more than his observation that Burton was not volunteering information as the others being asked for identification had done. Because Detective Burke did not articulate valid reasonable suspicion to support an investigatory stop of Burton, the detective did not have a legal basis to conduct a search of Burton's pocket. We find Detective Burke's search of Burton's pocket was unlawful, and, thus, the gun discovered as a result of the search should have been suppressed pursuant to the Exclusionary Rule of the Fourth Amendment. As the weapon should have been suppressed, we find the trial court erred in not granting Burton's motions for directed verdict.

## CONCLUSION

A law enforcement officer may approach citizens and attempt to question them without implicating the Fourth Amendment. When reasonable suspicion that crime may be afoot exists, the law enforcement officer may elevate the "police-citizen encounter" to an investigatory stop. At that point, the law enforcement officer may conduct a protective search of the stopped individual, provided the officer possesses a reasonable suspicion that the individual is armed and dan-

gerous. Without such a belief, supported by articulable facts, the officer is precluded from making the protective search.

In the case *sub judice*, Detective Burke did not possess the requisite reasonable suspicion to elevate his "police-citizen encounter" with Burton to an investigatory stop. As a result, Detective Burke did not have the right to frisk Burton or search Burton's coat pocket for weapons or any other contraband. Because the search of Burton's pocket was improper, the trial court's refusal to grant a directed verdict on all the charges resulting from this improper search is

**REVERSED.**

CURETON and GOOLSBY, JJ., concur.