576 S.E.2d 185

**In the Interest of JEREMIAH W., a minor under the age of seventeen years, Appellant.**

**No. 3588.**

Court of Appeals of South Carolina.

Heard Oct. 10, 2002.
Decided Jan. 6, 2003.
Rehearing Denied Feb. 20, 2003.

Assistant Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson, Senior Assistant Deputy Attorney General Harold M. Coombs, Jr., of Columbia; Edgar Lewis Clements, III, of Florence, for State of South Carolina.

HEARN, C.J.:

Jeremiah W. appeals his convictions for breach of the peace and threatening a public official, arguing the trial court erred in failing to grant his motions for directed verdict because (1) his arrest for breach of the peace was unlawful, and (2) he was entitled to resist the arrest so that his actions and comments following the arrest did not constitute a threat against a public official. We reverse.

## FACTS

In June 2000, two uniformed police officers employed to provide off-duty security services at a Florence County apartment complex noticed Jeremiah, a fourteen year-old juvenile, walking toward the front of the complex. Officer Mickey Cooke testified that Officer Gloria Howard told him she thought Jeremiah had a trespassing warning against him. Officer Cooke then attempted to call Jeremiah over to his patrol car. He testified that Jeremiah responded by yelling profanity at him while continuing to walk. Cooke then exited his patrol car and approached Jeremiah. He stated that upon "intercepting" the juvenile, Jeremiah "turned around .... pulled his pants up. And he went 'What?' in my face with his arms bowed out," while in the presence of adults and children outside the apartment complex. Cooke testified that he took this as an aggressive action; however, he acknowledged that Jeremiah's hands and arms were back, not forward. At that point, Officer Cooke placed Jeremiah under arrest for being

loud, boisterous, and using profanity in public, in violation of S.C.Code Ann. § 16–17–530 (1976).

Officer Cooke then handcuffed Jeremiah and placed him in the backseat of his patrol car to transport him to the detention center. Cooke, however, did not seatbelt Jeremiah in the car. Cooke testified that while en route to the detention center he attempted to question Jeremiah concerning his identity and relatives whom he could call regarding Jeremiah's arrest. Jeremiah refused to give him any information, stating, "I ain't got to do what you say." Cooke then testified that Jeremiah became irate, began yelling profane remarks, and attempted to stick his head through the plexi-glass panel separating the back and front seats of the patrol car. Officer Cooke believed Jeremiah was puckering his lips as if he intended to spit on him. Officer Cooke then "cap-stunned" the backseat, spraying Jeremiah with a chemical agent. He closed the plexi-glass window and proceeded to the detention center. He stated that Jeremiah then began to threaten him, stating he would "blow [his] 'f——ing' head off." This led to the charge of threatening a public official in violation of S.C.Code Ann. § 16–3–1040 (1976).

Officer Howard testified similarly to Officer Cooke; however, she stated that she informed Officer Cooke another security officer had stopped Jeremiah the day before and advised her that Jeremiah was going to be placed on the "banned and barred list." She did not indicate to him, as Cooke testified, that Jeremiah was already on a list banning individuals from the property.

At trial, Jeremiah's attorney made a motion for a directed verdict at the conclusion of the State's case. The family court judge denied the motion. Jeremiah's attorney renewed the motion at the end of trial, which was also denied. The family court judge found Jeremiah guilty of both charges and committed him to the Department of Juvenile Justice for a period not to exceed his twenty-first birthday.

## STANDARD OF REVIEW

In reviewing the refusal to grant a directed verdict in a criminal case, the evidence is viewed in the light most favorable to the State to determine whether there is any

direct or substantial circumstantial evidence which reasonably tends to prove the guilt of the accused, or from which guilt may be fairly and logically deduced. *State v. Pinckney*, 339 S.C. 346, 349, 529 S.E.2d 526, 527 (2000). The court is concerned with the existence or nonexistence of evidence, not its weight. *State v. Mitchell*, 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000). Furthermore, the court should not refuse to grant the directed verdict motion when the evidence merely raises a suspicion that the accused is guilty. *Id.*

## LAW/ANALYSIS

■ Jeremiah argues the trial court should have directed a verdict of acquittal on the charge of breach of the peace because his conduct did not constitute a breach of the peace. We agree.

■ The offense of breach of the peace is defined as "a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence, which includes any violation of any law enacted to preserve peace and good order." *State v. Poinsett*, 250 S.C. 293, 297, 157 S.E.2d 570, 571, 572 (1967). However, the crux of the offense, and "[w]hether [the] conduct constitutes a breach of the peace depends on the time, place, and nearness of other persons." *State v. Peer*, 320 S.C. 546, 552, 466 S.E.2d 375, 378 (Ct.App. 1996). While it is not necessary that the peace actually be broken in order to sustain a conviction for the offense of breach of the peace, there must be at least, "commission of an unlawful and unjustifiable act, tending with sufficient directness to breach the peace." *Id.*

Here, no actual breach of the peace occurred. While the State was not required to put up any witnesses who would specifically testify that Jeremiah's actions caused them "to become violent or think about becoming violent" in order to establish a breach of the peace, there must be some evidence that Jeremiah's actions/speech caused at least a minimal level of "nervousness, frustration, anxiety," anger, or other evidence that the peacefulness of the neighborhood had been breached. *Id.* at 549, 466 S.E.2d at 377 (stating residents' nervousness, anxiety and frustration which resulted in numerous calls to law enforcement in response to appellant's "booming music,"

was ample evidence for submission to the jury on breach of peace charge).

Here, the record reveals that the State did offer evidence of the effect of Jeremiah's conduct on the bystanders through the officers' testimony. Officer Cooke testified that when he walked over to Jeremiah there were several people outside standing on the sidewalk. He stated Jeremiah "was just in front of a bunch of people trying to make a show basically." He admitted that Jeremiah never addressed the crowd or asked them to do anything. Cooke estimated there were ten to fifteen people approximately 30 to 40 feet away. Significantly, the bystanders "came out to see what was going on . . . . [w]hen I got out of the car and started walking after him." The crowd never reacted in any way after he arrested Jeremiah. Officer Howard also estimated there were approximately ten people outside, comprised of adults and children. She testified that the crowd did not become involved in the incident between Jeremiah and Officer Cooke or react in any manner and stated "they were just watching." (emphasis added)

At most, the officers' testimony amounted to evidence of their own fear of a potential for a breach of the peace. *See Texas v. Johnson*, 491 U.S. 397, 408–09, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (rejecting state's argument that it need only prove a potential for breach of the peace to prove a violation, and instead requiring "careful consideration of the actual circumstances surrounding such expression, asking whether the expression 'is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.' ") (citation omitted). The evidence, however, reveals that this fear was unwarranted.

█ Nor do we believe that the evidence supports an arrest for breach of the peace as a result of Jeremiah's alleged "bowing up" at Officer Cooke. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *State v. Perkins*, 306 S.C. 353, 355, 412 S.E.2d 385, 386 (1991) (citing *City of Houston v. Hill*, 482 U.S. 451, 462–63, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987)). The United States Supreme Court

has consistently recognized that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Hill*, 482 U.S. at 461, 107 S.Ct. 2502. "The State may not punish a person for voicing an objection to a police officer where no fighting words are used." *State v. Pittman*, 342 S.C. 545, 548, 537 S.E.2d 563, 565 (Ct.App.2000) (citation omitted). Fighting words are words which "by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Perkins*, 306 S.C. at 354, 412 S.E.2d at 386 (citations omitted). "As further noted by the Supreme Court, the 'fighting words' exception may require narrow application in cases involving words addressed to a police officer 'because a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen.'" *Id.*

Officer Cooke's testimony explaining the incident is revealing. When questioned whether it was Jeremiah's responsibility to come over when he called to him, Cooke responded: "... [I]t was the loud and boisterous way he said it and using profanity in public, *that's against the law.... That's all it takes.*" (emphasis added). He actually informed Jeremiah that he was "under arrest for breach of peace [sic] for being loud and boisterous and using profanity in public." Officer Cooke further testified in support of his authority to arrest that Jeremiah bowed up at him when he stopped him.

Jeremiah denied using profanity towards Officer Cooke. He testified that when stopped, he turned around to face Cooke, and "pulled up my pants because I didn't have on my belt." Jeremiah admitted bowing up to Cooke in response to an alleged remark made by him; however, he described the action as one where he pulled up his pants and asked "What?" while his arms were back and his palms were facing open and out. Officer Cooke agreed that Jeremiah's arms were back, not forward.

It is well settled that the use of profanity alone does not constitute fighting words. *See Pittman*, 342 S.C. at 551, 537 S.E.2d at 566. Officer Cooke's own testimony indicates that his decision to arrest Jeremiah was based on his language and the fact that he was being loud and boisterous. Cooke never stated that Jeremiah made any actual threats towards him

until he arrested Jeremiah and placed him in his patrol car. Therefore, from Cooke's own testimony, it appears that Jeremiah's arrest was based on nothing other than his profane language, which does not fall within the fighting words exception to the First Amendment, and his loud and boisterous conduct. In *State v. Perkins*, our supreme court determined that probable cause to arrest an individual "requires more than profanity or loud and boisterous behavior directed at the officers." *Pittman*, 342 S.C. at 551, 537 S.E.2d at 566 (discussing *Perkins*, 306 S.C. 353, 412 S.E.2d 385 (1991)). Therefore, we find Jeremiah was entitled to a directed verdict on the breach of peace charge.

■ Having found Jeremiah was unlawfully arrested on the charge of breaching the peace, we must next consider whether Jeremiah's response to that unlawful arrest constituted a new and distinct crime, thereby justifying his charge for threatening a public official. This court recently considered this issue in *State v. Burton*, 349 S.C. 430, 562 S.E.2d 668 (Ct.App.2002). In *Burton*, an officer unlawfully seized Burton in violation of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In response, Burton fought with the officer. During the struggle, Burton removed a gun from his coat, pointed it at the officer, and pulled the trigger several times. The gun jammed, however, and Burton was subdued and arrested. After the arrest, Burton continued to struggle and shout obscenities at the officers. He also spit in an officer's direction. *Id.* at 433–34, 562 S.E.2d at 670. Burton was charged with two counts of assaulting an officer while resisting arrest, one count of assault with the intent to kill an officer, and one count of assault with a deadly weapon with intent to kill an officer. *Id.*

The State argued that despite the officer's unlawful seizure, Burton's assault and attempts to shoot the officer were new and distinct crimes justifying his arrest. *Id.* at 440, 562 S.E.2d at 673. The State cited *State v. Nelson*, 336 S.C. 186, 519 S.E.2d 786 (1999), for the proposition that despite the strong causal connection in fact between lawless police conduct and a defendant's response, if the defendant's response is itself a new and distinct crime, the police may arrest the defendant for that crime. *Id.* at 194, 519 S.E.2d at 790. This court declined to apply *Nelson* in Burton's case and held his

behavior resulted from a "continuous flow of action and conduct having a direct nexus to the defective *Terry* frisk and emanating from the initial 'police-citizen encounter.' "   *Id.* Likewise, we believe the actions that led to Jeremiah's charge for threatening a public official were part of a continuous flow of action and conduct emanating directly from his unlawful arrest for breach of the peace.   Accordingly, Jeremiah's convictions are

**REVERSED.**

HOWARD, J., concurs.

GOOLSBY, J., dissents in a separate opinion.

GOOLSBY, J. (dissenting):

I respectfully dissent.   Jeremiah W. (the juvenile) appeals his convictions for threatening a public official and breach of the peace, arguing the trial court erred in failing to grant his motions for directed verdict because (1) his arrest for breach of the peace was unlawful and (2) the illegality of his arrest permitted him to resist using deadly force, if necessary, so that his actions and comments following his arrest did not constitute a threat against a public official.   I would affirm.

## ANALYSIS

### I.  Directed Verdict on Breach of Peace Charge

The juvenile first argues the trial court should have directed a verdict of acquittal on the breach of the peace charge.   He claims the underlying arrest was unlawful.   I disagree.

"Breach of the peace is a common law offense which is not susceptible of exact definition." [1]   Breach of the peace is a generic term "embracing a great variety of conduct destroying or menacing public order and tranquility." [2]   "In general terms a breach of peace is a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence, which includes any violation of any law

---

1.  *State v. Randolph,* 239 S.C. 79, 83, 121 S.E.2d 349, 350 (1961).

2.  *State v. Peer,* 320 S.C. 546, 552, 466 S.E.2d 375, 379 (Ct.App.1996).

enacted to preserve peace and good order."[3] For a breach of the peace to occur, it is not necessary that the peace actually be broken. No more is required than that the act be unjustifiable and have the tendency with sufficient directness to break the peace.[4]

Here, an officer attempted to investigate a possible trespassing violation based on information supplied by a fellow officer.[5] When the officer attempted to communicate with him, the juvenile walked away and shouted a profane remark in the presence of private citizens. When directly confronted by the officer, the juvenile took an aggressive stance by pulling up his pants, bowing out his chest, and getting in the officer's face.

The crux of the juvenile's argument is that he had a right to be on the premises and that merely cursing in public and questioning a police officer's conduct was not unlawful. The juvenile's argument, however, ignores the evidence that approximately ten children and adults stood in a nearby public area when the juvenile yelled profane remarks at the officer. It also ignores the evidence of the juvenile's hostile and threatening demeanor when the officer approached him with information that the juvenile might be trespassing. The juvenile, then, did not merely curse the officer.[6] He acted belligerently and aggressively toward the officer in a public place while others looked on.[7]

---

3. *State v. Poinsett*, 250 S.C. 293, 297, 157 S.E.2d 570, 571 (1967).

4. *State v. Langston*, 195 S.C. 190, 11 S.E.2d 1 (1940).

5. Even though the officers were off-duty, this "did not strip [them] of [their] office." A police officer's status may be exercised whenever the public need or his duty requires it. *League v. Nat. Sur. Corp.*, 198 S.C. 289, 17 S.E.2d 783, 785 (1941).

6. The U.S. Supreme Court has recognized the "fighting words" exception to protected speech, meaning that the conduct must constitute more than mere spoken words. *See Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

7. *See City of Columbia v. Brown*, 316 S.C. 432, 450 S.E.2d 117 (Ct.App. 1994) (holding that verbally assaulting police officers with vulgar, abusive language and racial slurs ("fighting words") constituted a breach of the peace); *State v. Brahy*, 22 Ariz.App. 524, 529 P.2d 236

Accordingly, I would find that the State presented sufficient evidence that the juvenile committed a breach of the peace warranting the denial of his directed verdict motions.

## II. Directed Verdict on the Threatening a Public Official Charge

The juvenile next argues the trial court should have directed a verdict of acquittal on the charge of threatening a public official. He contends he was entitled to use profanity and engage in other actions while in custody because he was entitled to use deadly force to resist an illegal arrest. Since I would have found that the arrest was legal, I need not reach this issue.

(1974) (holding that offensive language and spitting is a breach of the peace).